UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp, U.S.D.J. |
| | : | |
| v. | : | Crim. No. 24-128 (MAS) |
| | : | |
| ELIYAHU WEINSTEIN, | : | **Motion for Rejection of** |
| a/k/a "Mike Konig" | : | **Attorney-Client Privilege Claim** |
| | : | |

Eliyahu ("Eli") Weinstein's conclusory and unsubstantiated claim that his co-conspirator Shlomo Erez was acting as his attorney while helping him to perpetrate a Ponzi scheme is delaying discovery and obscuring the truth. The Government respectfully asks this Court for a prompt determination that Weinstein's communications with Erez are not attorney-client privileged. This will allow the prosecution team to interview Erez about the substance of the charges and to begin to review the voluminous evidence extracted from his phone.

## BACKGROUND

### A. Erez Helped Weinstein Commit Another Major Fraudulent Scheme.

Weinstein was previously convicted of two separate investment fraud schemes, the first of which he committed from 2004 through 2011, and the second of which he committed—while he was on pretrial release—from 2012 through 2013. *See* Crim. No. 11-701 (MAS); Crim. No. 14-219 (MAS). Weinstein's first two investment fraud schemes collectively resulted in losses to investors of approximately $230 million. *See* Crim. No. 11-701, ECF. No. 203; Crim. No. 14-219, ECF No. 93. The Honorable Joel A. Pisano sentenced him to 24 years in prison for

those crimes, to be followed by a three-year term of supervised release. *Id*. It also ordered that he pay $230,406,799 in restitution to his victims. *Id.*

On January 19, 2021, less than 8 years into Weinstein's 24-year sentence, the President of the United States commuted his prison sentence to a period of time served, leaving intact the supervised release and restitution components. *See* Crim. No. 11-701, ECF Nos. 217, 219. The next day, Weinstein was released from custody and began serving his three-year term of supervised release under the supervision of the United States Probation Office.

Weinstein wasted no time in orchestrating yet another Ponzi scheme. Weinstein and his co-conspirators, including Aryeh "Ari" Bromberg, Joel Wittels, Shlomo Erez, Alaa Hattab, Christopher Anderson, and Richard Curry, bilked tens of millions of dollars from investors. *See* Crim. No. 24-128 (MAS), ECF No. 85, at ¶ 3. Two pairs of co-conspirators acted through two separate corporate entities. *See id.* at ¶¶ 1(c)-(i). Wittels and Bromberg owned Optimus Investments Inc. ("Optimus"), which raised money from investors, purportedly to finance the purchase and sale of medical supplies and other goods. *See id.* at ¶¶ 1(c), (e)-(f). Although not affiliated with Optimus on paper, Weinstein directed Wittels and Bromberg where and how to move investor money. And Anderson and Curry owned Tryon Management Group LLC ("Tryon"), which raised money from investors, purportedly to finance Optimus's transactions. *See id.* at ¶ 1(g). To convince people to give the companies money, Weinstein and co-conspirators: (a) actively concealed Weinstein's identity (he went by the alias "Mike Konig") and role in purported investments; (b) falsely

2

claimed that the funds would be invested in lucrative deals involving, among other things, COVID-19 masks, scarce baby formula, and first-aid kits bound for Ukraine; and (c) operated a Ponzi-like scheme by using new investor money to pay off earlier investors. *See id.* at ¶¶ 3-4.

Erez is a citizen of Israel and a lawyer in Israel, though he has never been licensed to practice law in the United States. But Erez's status as a lawyer had nothing to do with his role in the conspiracy. Instead, Weinstein used Erez as a nominee to steal and hide money, acquire assets, and lend an air of legitimacy to the fraud. *See* ECF No. 1 at ¶¶ 48-52. Weinstein was on supervised release at the time and could not use bank accounts in his own name without tipping off the Probation Office. *Id.* So Weinstein used Erez and his bank accounts to misappropriate investor money. *Id.* In total, Weinstein directed the transfer of approximately $12.3 million from Optimus to Erez. *Id.* at ¶ 48. Erez even held assets on Weinstein's behalf, including an option to purchase a Penthouse apartment in Miami, known as the Regalia, and he purportedly invested in a commercial real estate deal in Morocco on Weinstein's behalf. *See id.* The Government is still trying to identify what happened to all of the money Weinstein and his co-conspirators stole from investors. Access to Erez and his communications is, therefore, critical to understanding the full scope of the fraud committed by Weinstein and his co-conspirators.

Later on in the conspiracy, as the tide rolled out and investors started asking questions, Erez agreed to provide false and misleading information to investors to

continue to conceal Weinstein's identity and to prevent them from asking for their money back. *Id.*

    **B.    A Grand Jury Indicted Weinstein and Bromberg for Fraud and Obstruction Crimes, and Other Co-Conspirators Have Pled Guilty.**

In July 2023, Weinstein, Bromberg, Wittels, Erez, and Hattab were arrested and charged by complaint with: (1) conspiracy to commit wire fraud, contrary to 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349; and (2) conspiracy to obstruct justice, contrary to 18 U.S.C. § 1503, in violation of 18 U.S.C. § 371. *See id.*, ECF No. 1. The Government also executed search warrants at the homes of Bromberg and Weinstein and seized a number of electronic devices. The Government also seized Erez's phone pursuant to a search warrant. Over the next few months, Anderson, Curry, and Hattab all pled guilty to conspiracy and fraud crimes. *See* Crim. No. 23-684 (MAS); Crim. No. 23-689 (MAS); 23-866 (MAS).

On February 20, 2024, a grand jury charged Weinstein and Bromberg with:

- conspiracy to commit securities fraud, contrary to 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, in violation of 18 U.S.C. § 371 (Count One);

- securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2 (Count Two);

- conspiracy to commit wire fraud, in violation 18 U.S.C. § 1349 (Count Three);

- three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Four, Five, and Six); and

- conspiracy to obstruct justice, contrary to 18 U.S.C. § 1503, in violation of 18 U.S.C. § 371 (Count Seven).

Crim. No. 24-128 (MAS), ECF. No. 85. The complaint against Erez and Wittels is currently on continuance. *See* 23-MJ-3038, ECF Nos. 81 and 82. Wittels is scheduled to enter a guilty plea before Your Honor to an information on March 21, 2024.

### A. January 2024: Weinstein Made an Unsubstantiated Claim of Privilege.

The Government preemptively assigned a filter team to review and litigate any potential privilege issues arising from the seizure of electronic devices over the course of this investigation. Over the last few months, the filter team has been attempting to negotiate filter terms with Weinstein's and Bromberg's counsel, in an effort to remove any potentially privileged communications before the devices are turned over to the prosecution team.

Bromberg's counsel, Ricardo Solano and Christina LaBruno, Esqs., have confirmed that Erez never acted as Bromberg's personal attorney. While Mr. Solano has said that he and his firm do not represent Optimus, Mr. Solano has declined to state whether Bromberg would assert a privilege on Optimus's behalf over communications with Erez. Specifically, Mr. Solano has represented to the Government that "given the pending criminal charges," Bromberg "is not in a position to give any statements regarding Optimus Investments Inc. and/or its current status." Wittels, the other co-owner of Optimus, has stated that Erez never represented him, nor Optimus.

For more than a month, Weinstein's counsel, Henry E. Mazurek and Ilana Haramati, Esqs., did not respond to the filter team's repeated efforts to discuss

5

potential privilege-related issues. Then, on a phone call on January 12, 2024, Weinstein's counsel stated for the first time that Weinstein intended to assert a privilege over communications with Erez on the ground that Erez was his personal lawyer. In addition, Weinstein's attorneys stated that they do not represent Optimus and do not intend to assert privilege claims on behalf of Optimus, but to the extent that there are allegations that Weinstein was working for Optimus, they may assert privilege over some of Weinstein's communications on the ground of the entity's privilege.

### B. Erez Denied Any Attorney-Client Relationship with Weinstein or Optimus.

On January 17, 2024, the Government conducted a proffer session with Erez limited to questions about whether he acted as a legal advisor over the course of the scheme. He denied representing or advising Weinstein or Optimus in any legal capacity.

Erez is an Israeli citizen who permanently resided in Israel (until his arrest). For the majority of his career, he has worked in a variety of business and government roles. Later in his career, Erez attended and graduated from law school in Israel. He is currently a member of the Israel Bar Association, but he is not and has never been licensed to practice law in the United States. According to Erez, even in Israel he does not regularly engage in the practice of law. When asked how many legal clients he had within the last approximately ten years, Erez estimated that it was fewer than fifteen. Even after he obtained a law degree, Erez has primarily focused on creating startup companies and other business endeavors.

Erez flatly rejected Weinstein's privilege claims. He denied, in no uncertain terms, ever having any attorney-client relationship with Weinstein or Optimus. Among other things, Erez never executed a retainer agreement with Weinstein or Optimus, never sent legal bills to Weinstein or Optimus, and has never been paid by Weinstein or Optimus for legal work. Erez further stated that he did not recall ever being asked to provide or ever actually providing legal advice to Weinstein or Optimus. Similarly, Erez said that he never had an attorney-client relationship with Bromberg or Wittels. Rather, Erez explained that he acted solely as an investor and business consultant to Weinstein, Optimus, Bromberg, and Wittels.

To be sure, the investigation revealed that various members of the conspiracy, including Erez himself, sometimes held Erez out to be an attorney for Weinstein and Optimus to third parties.[1] And some third parties *believed* Erez was acting as an attorney for Weinstein or Optimus.[2] However, Erez explained that even in those instances, he was not *actually* acting as an attorney for Weinstein or

---

[1] For example, in an email from Optimus to Curry, Anderson, and Tyron investors dated April 15, 2022, Bromberg and Wittels said: "When we realized that the war and sanctions would continue for an indefinite period of time, our attorney, Shlomi Erez, leveraged his relationships on our behalf to secure alternative financing needed to make all of us whole once again." Exhibit A. Erez's law firm letterhead and signature block are featured on a letter attached to that email. *See id.* Similarly, in an investor communication from Tryon, Curry and Anderson stated that they were working with Optimus; that "Harvard gave us a 1.6mm deposit to our lawyer, Shlomo Erez"; and "[h]ere is the deposit in our Lawyers account." Exhibit B, at 1-2. And in a March 2023 WhatsApp chat with Erez, Weinstein, Bromberg, Curry, and Anderson, Erez said "I explained to Richard that I am not US lawyer and as such I am using my associate who has US license. We take it seriously and it takes time." Exhibit C, at 6.

[2] For example, Anderson said that he thought Erez was an attorney who represented both Weinstein and Optimus at various times. Curry similarly said that he believed Erez was Optimus' Israeli lawyer.

7

Optimus. According to Erez, members of the conspiracy periodically held him out to be an attorney in an effort to assuage investor concerns about the status of their investments.

Documents and recordings reinforce that Erez acted in a business capacity, not as an attorney for Weinstein or Optimus. For example:

- In a WhatsApp conversation with Curry, Erez explicitly denied representing Optimus as a lawyer. *See* Exhibit D, at 4. Specifically, on or about September 15, 2022, Curry sent Erez a letter concerning an ongoing dispute with Optimus and others. *Id.* When Erez reviewed the letter the next day, he said "One thing that I would comment instantly I am not part of party B," which was a reference to Optimus. *Id.* (emphasis added). Instead, Erez stated that he merely has "some control over the Regalia and Morocco," suggesting that he was not a part of Optimus but had a role with respect to other aspects of the scheme. Later that day, Erez was even more explicit, stating, "**I am not Optimus leagal [sic] advisor**" (emphasis added).[3]

- In a surreptitious audio recording obtained by law enforcement of an August 31, 2022 meeting between Weinstein, Wittels, Bromberg, Erez, and Curry, Weinstein said "fu*king lawyer," to which Erez said "No, I'm talking . . . as a businessman, I'm talking as a businessman, I'm not talking as a lawyer[.]" Exhibit E (1:39:46).

- On September 28, 2022, Erez said to Curry over WhatsApp: "Richard I came here as per one person request to try to solve as to the business side." Exhibit D, at 7.

- On November 10, 2022, Curry wrote to Erez over WhatsApp: "Things are getting ugly here. And it will get ugly fast if no money comes in." *Id.* at 33. Curry then asked, "Please . . . do you even have 500k we can borrow? I need to pay some people so they calm down. . . . " *Id.* Erez responded, "Noted let me get things here and call you." *Id.*

---

[3] The Government will provide a copy of the exhibits referenced herein to the Court under seal and to Bromberg's counsel, with the exception of Exhibit E, which is a large audio file over three hours in length. Weinstein has not yet entered into a protective order, so the Government will provide Weinstein with these materials, if and when he does.

Other witnesses corroborate Erez's position. For example, during a proffer on November 17, 2023, the Government asked Wittels about his April 15 investor update, which referred to Erez as Optimus' attorney. Wittels explained that Erez was not acting as a lawyer and did not provide Optimus any legal advice. Wittels said, in sum and substance, that he had referred to Erez as a lawyer because Erez *was* a lawyer but that Erez played more of a transactional role, facilitating the flow of money as directed by Weinstein. In fact, Wittels stated that at one point, Erez even recommended that Optimus hire an attorney to work on an investor letter, further underscoring that Erez was not acting as an attorney for Optimus.

### C. Weinstein Has Refused to Explain the Nature of his Alleged Attorney-Client Relationship or Any Privileged Communications with Erez.

On January 29, 2024 and February 1, 2024, the filter team again reached out to Weinstein's attorneys to try to confirm precisely what privileges Weinstein intended to assert and the basis for those assertions. On February 6, 2024, the prosecution team met with Weinstein's counsel and raised the privilege claim, and Weinstein's attorneys responded that they would provide the information within 5-7 days. When Weinstein's attorneys had still not provided any explanation or support for their bare invocation of privilege by February 15, 2024, the filter team sent a letter to Weinstein's attorneys, stating that if Weinstein did not respond by close of business the next day, it would consider any privilege claim over communications involving Erez to be withdrawn. *See* Exhibit F. Weinstein's counsel did not respond by that deadline, too.

On February 20, 2024, Weinstein's attorneys finally responded to the filter team's questions with a bare invocation of privilege, stating:

> Specifically, Shlomo Erez represented Mr. Weinstein in his personal capacity with respect to several transactions and potential transactions. Mr. Weinstein thus maintains the privilege with respect to communications involving Shlomo Erez. We also understand that Shlomo Erez represented Optimus and that privilege has not been waived, and is being asserted as well.

Weinstein's attorneys provided no evidentiary support for any of these claims, no further details, and no explanation as to how the Optimus privilege was allegedly "being asserted."

Due to Weinstein's belated and baseless invocation of privilege, as well as Bromberg's refusal to state his position with respect Optimus's privilege, law enforcement has been unable to review the communications on Erez's phone or even speak with Erez in detail about the conspiracies, clearly prejudicing the Government's prosecution of the co-conspirators and its attempt to locate and identify forfeitable assets and property that could be used to get some money back to the victims of Weinstein's various frauds. Weinstein's claim also prevents the Government from reviewing materials on other electronic devices that may contain communications with or concerning Erez.

## ARGUMENT

### A. Nothing Suggests an Individual Attorney-Client Relationship.

As the party invoking privilege, which "obstructs the search for the truth," *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979), Weinstein bears the burden to show the privilege's existence and application. *Matter of Bevill,*

10

*Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir.1986). He must establish both the existence of an attorney-client relationship and that communications were made "for the purpose of obtaining or providing legal assistance." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (cleaned up). "[T]he bare assertion" of an attorney-client relationship is wholly insufficient to make this showing. *United States v. Carter*, 966 F. Supp. 336, 344 (E.D. Pa. 1997), *aff'd sub nom. United States v. Ellis*, 156 F.3d 493 (3d Cir. 1998).

Whether an attorney-client relationship existed is a fact-based inquiry. For example, in *Montgomery Cnty. v. MicroVote Corp.*, 175 F.3d 296, 302 (3d Cir. 1999), the Third Circuit reflected that "the manner in which a person is hired and the resulting services that are performed are of the utmost importance." The County met its burden in that case by producing an engagement letter describing the issues on which counsel would advise, showing that the firm "billed the county for [the attorney's] services, and the County paid the Firm," through testimony about the relationship, and because the lawyer conducted the legal service of negotiating a contract for the County. *Id.*

A person's mere status as a lawyer does not privilege communications. And an attorney acting as "as a conduit for a client's funds . . . or as a business advisor" is not providing legal advice. *United States v. Spencer*, 700 F.3d 317, 320 (8th Cir. 2012). In *United States v. Hoffecker*, for example, the Third Circuit held that the defendant's former attorney was acting as his business associate, not his lawyer, at

11

the time he was cooperating against him. 530 F.3d 137, 156 (3d Cir. 2008) (superseded on other grounds by guidelines amendments).

Nor does evidence that an attorney represented a person's business establish an individual attorney-client relationship. In *Carter*, "assertions that [an attorney] handled some landlord tenant matters and matters regarding bill collectors" was insufficient to establish that she represented the defendant individually. *Carter*, 966 F. Supp. at 344. The defendant failed "to show that those matters were handled for [him] in his personal capacity and not for [his] corporation[.]" *Id.*

Here, Weinstein has made nothing but the barest assertion of an individual attorney-client relationship. He does not explain how, when, or for what purpose he retained Erez as an attorney. "[T]o call the evidence supporting [Weinstein's] claim 'thin' would be generous as 'microscopic' would be the more appropriate word." *Hoffecker*, 530 F.3d at 156.

### B. Weinstein Has No Power to Assert a Non-Existent Corporate Privilege on Behalf of Optimus.

In addition to establishing an attorney-client relationship and legal advice, the party seeking to avoid discovery must also show that "the privilege has been [] claimed and [] not waived by the client." *In re Grand Jury Investigation*, 599 F.2d at 1233. A corporate privilege "belongs to the corporation," not its officers or managers. *Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d at 124. The power to assert or waive it "rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985). "[C]ontrol of the privilege passes with control of the

corporation." *Teleglobe*, 493 F.3d at 372. So "[d]isplaced managers may not assert the privilege over the wishes of current managers[.]" *Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d at 124. And "managers . . . must exercise the privilege in a manner consistent with . . . the best interests of the corporation and not of themselves as individuals." *Weintraub*, 471 U.S. at 348-49. The Third Circuit has rejected individual directors' attempts to assert a blanket corporate privilege on the basis that "their personal legal problems were inextricably intertwined with those of the corporation." *Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d at 124.

Weinstein has failed to affirmatively assert an attorney-client relationship or privilege on behalf of Optimus, let alone any facts that would support finding one. Instead, his attorneys "understand that Shlomo Erez represented Optimus and that privilege has not been waived." But Wittels, one of Optimus's owners, has affirmatively stated that Erez did *not* act as the company's attorney and has waived any privilege that might exist. Erez similarly denies an attorney-client relationship with Optimus. For his part, Bromberg, Optimus's other co-owner, has refused to state whether Erez acted as an attorney for Optimus but has offered nothing suggesting otherwise. The fact that the co-conspirators occasionally held Erez out as the company's lawyer (which Erez admits was an attempt to create a false sense of confidence about the fraudulent scheme), is wholly insufficient to establish that he acted as one. Erez's affirmative denials that he was acting as a lawyer during the course of the conspiracy further show that he was not. *See Hoffecker*, 530 F.3d 137, 156.

Finally, even if a corporate privilege existed, Weinstein could not claim it himself. He is not an officer with control over the corporate privilege. Instead, that power resides with Wittels and Bromberg, who have either waived any privilege that might have existed (Wittels), or have failed to make an affirmative claim of privilege (Bromberg).

### C. Alternatively, Weinstein's and Optimus' Communications with Erez Were in Furtherance of a Crime or Fraud.

"The privilege takes flight if the relation is abused." *United States v. Zolin*, 491 U.S. 554, 562 (1989) (cleaned up). So even if Erez had acted as an attorney and made communications for the purpose of giving or obtaining legal advice, Weinstein nevertheless "must let the truth be told." *Id.* (cleaned up). That is because his communications with Erez fit easily within the crime-fraud exception to the attorney-client privilege.

The party seeking discovery—here, the Government—bears the burden to establish a prima facie case that the crime-fraud exception applies. *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005). "[A] reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud . . . is enough to break the privilege." *In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 153 (3d Cir. 2012). The reasonable basis standard does not require "evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred." *Id.* at 153–54. At no point is there "heightened standard beyond the requisite prima

14

facie showing" of a reasonable basis. *United States v. Scarfo*, 41 F.4th 136, 175 (3d Cir. 2022), *cert. denied sub nom. Pelullo v. United States*, 143 S. Ct. 1044, 215 L. Ed. 2d 201 (2023).

An indictment charging the elements of the crime-fraud exception satisfies the reasonable basis test. *See United States v. Gorski*, 807 F.3d 451, 461 (1st Cir. 2015) ("the indictment provides a reasonable basis to believe that Gorski and/or Legion was engaged in criminal or fraudulent activity"). That is because a grand jury issues an indictment upon a finding of probable cause, *Kaley v. United States*, 571 U.S. 320, 327 (2014), which means "a reasonable ground for belief of guilt," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Once the government makes out a prima facie case, the burden shifts to the party defending the privilege to explain, "by evidence and argument," why the privilege should remain intact. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 97 (3d Cir. 1992), *as amended* (Sept. 17, 1992).).

The indictment in this case, which charges Weinstein with conspiracies and substantive fraud crimes, establishes a reasonable basis to believe that he committed crimes. *See* ECF No. 85. And while some indictments may not speak to the second element of the crime-fraud exception—whether otherwise privileged communications were used in furtherance of the alleged crime—this one does. The grand jury's finding that Weinstein and Erez worked together to commit fraud would defeat any privilege possibly mustered by Weinstein's vague and broad formulation of the attorney-client relationship and privilege. *See id.* at 2, 16-17

(describing a meeting at which Weinstein, Erez and others "agreed to continue . . . running the Ponzi scheme," and a message from Weinstein to Erez and another co-conspirator suggesting specific actions to continue the fraud); 25-27 (Erez secretly controlled millions of dollars of Weinstein's assets in order to conceal them from the government and avoid paying court-ordered restitution).

Of course, as explained above, Weinstein has not established any attorney-client relationship in the first place, nor has he identified any specific communications or categories of communications as privileged. The Government's motion should be granted on that basis alone.

## CONCLUSION

For these reasons, the Government respectfully asks this Court for a swift determination that Weinstein has not established that his communications with Erez were attorney-client privileged. Such an order will allow the Government to process certain voluminous discovery in this case, to interview Erez without limitation, and, hopefully, locate and recover some investor funds.

Respectfully submitted,

PHILIP R. SELLINGER
UNITED STATES ATTORNEY

By:   *s/ Jonathan Fayer*
      Jane Dattilo
      Jonathan Fayer
      Carolyn Silane
      Mark J. Pesce
      Assistant U.S. Attorneys