<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ELIYAHU "ELI" WEINSTEIN & ARYEH "ARI" BROMBERG. | Criminal Action No. 24-128 (MAS)<br><br>**MEMORANDUM OPINION**<br>**UNDER SEAL** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court upon the United States of America's Filter Team's (the "Filter Team") sealed motion for the rejection of Defendant Eliyahu "Eli" Weinstein's ("Weinstein") attorney-client privilege claim or, alternatively, for application of the crime-fraud exception and for the rejection of Weinstein's joint representation claim (ECF No. 137). Weinstein opposed (ECF No. 145), and the Filter Team replied. (ECF No. 149). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1(b), which is applicable to criminal cases under Local Criminal Rule 1.1. For the reasons set forth herein, the Court grants the Filter Team's motion.

**I.    BACKGROUND**

The Court recites only the facts necessary to resolve the instant motion. On July 18, 2023, Weinstein, Shlomo Erez ("Erez"), and others were arrested and charged with crimes. (Compl., ECF. No. 1.) The United States of America (the "Government") preemptively assigned a Filter Team to review potential privilege issues that could arise during its investigation because Erez holds a law license in Israel. (Filter Team's Moving Br. 5, ECF No. 137.) On January 12, 2024,

Weinstein asserted privilege over his communications with Erez on the basis that Erez was his personal lawyer. (*Id.*)

On February 20, 2024, Weinstein was indicted in the District of New Jersey by a grand jury for the following Counts: (1) Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371 (Count One); (2) Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; Title 17, C.F.R. § 240.10b-5; and 18 U.S.C. § 2 (Count Two); (3) Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count Three); (4) Wire Fraud, in violation of 18 U.S.C. §§ 2 and 1343 (Counts Four through Six); and (5) Conspiracy to Obstruct Justice, in violation of 18 U.S.C. § 371 (Count Seven). (Indictment, ECF No. 85.) The Indictment alleges that from approximately December 2021 until July 2023, Weinstein and his co-conspirators orchestrated a scheme to defraud investors by actively concealing Weinstein's identity from investors, falsely claiming the investor funds would be used in lucrative deals, and engaging in a Ponzi-like scheme to pay off earlier investors with new investor money. (*Id.* at 2, 5.) One way that Weinstein and his co-conspirators allegedly raised money from investors was through the company Optimus Investments Inc. ("Optimus"). (*Id.* at 4.)

On April 10, 2024, the Government filed a motion, *inter alia*, for the rejection of Weinstein's attorney-client privilege claim and/or application of the crime-fraud exception as to communications with Erez. (Gov't's Mot., ECF No. 94.) Weinstein opposed this motion, (Weinstein's Opp'n to Gov't's Mot., ECF No. 96), the Government replied (Gov't's Reply, ECF No. 102), Weinstein submitted a sur-reply (Weinstein's Sur-Reply, ECF No. 103), and the Government submitted a sur-reply (Gov't's Sur-Reply, ECF No. 107). On May 29, 2024, shortly before the Government's motion was fully briefed, the Filter Team produced the relevant messages from Erez's cell phone to Weinstein's counsel for review. (Filter Team's Moving Br. 5.)

The Court held oral argument on July 3, 2024, and denied the Government's motion without prejudice to allow Weinstein the "opportunity to review the privilege log and filtered materials." (Tr. 67, ECF No. 128.) The Court also noted that "should the [G]overnment demonstrate and submit sufficient evidence and file an appropriate motion, the Court will revisit this issue." (*Id.* at 68.)

On July 22, 2024, Weinstein produced a privilege log after reviewing the messages between himself and Erez that were recovered from Erez's cell phone. (Filter Team's Moving Br. 1.) Weinstein asserted privilege over 14,844 of the 19,205 messages recovered. (*Id.*) On August 30, 2024, the Filter Team filed the instant motion for rejection of Weinstein's claim of attorney-client privilege and/or application of the crime-fraud exception (*Id.*). The motion has now been fully briefed by the parties. (*See* Weinstein's Opp'n, ECF No. 145; Filter Team's Reply, ECF No. 149.)

## II.     DISCUSSION

### A.     Attorney-Client Privilege

The Filter Team argues that Weinstein and Erez were only business partners and co-conspirators, and therefore, that there was no attorney-client relationship between them. (Filter Team's Moving Br. 9.) In opposition, Weinstein claims that the documents prove an attorney-client relationship existed between Weinstein and Erez and that the Government mistakenly relies on a "small selection of messages" to prove otherwise. (Weinstein's Opp'n Br. 2-6.)

### 1.     *Legal Standard*

The attorney-client privilege is designed to encourage "full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The Third Circuit has established that:

> [c]ommunications are protected under the attorney-client privilege when: (1) legal advice of any kind is sought (2) from a professional

> legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection [may] be waived.

*In re Impounded*, 241 F.3d 308, 316 n.6 (3d Cir. 2001) (quoting *In re Grand Jury Empanelled Feb. 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979) (alterations in original) (citations omitted).

Importantly, the privilege "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423-24 (3d Cir. 1991) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). "Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." *Id.* at 1423. The party asserting the attorney-client privilege bears the burden of demonstrating the applicability of the privilege. *Grand Jury Empanelled Feb. 14, 1978*, 603 F.2d at 474.

### 2. *Analysis*

#### a. **Attorney-Client Relationship**

Weinstein bears the burden of demonstrating that the attorney-client privilege applies to his communications with Erez. *See id.* As an initial matter, Weinstein has not offered a formal retainer agreement or billing records related to Erez's purported representation. (Filter Team's Moving Br. 53.) The Filter Team, on the other hand, cites a "Consulting Agreement" between Weinstein and Erez that includes a clause acknowledging that the parties to the contract have no relationship with each other outside of that consulting agreement. (Filter Team's Moving Br., Ex. Q at 20-22.) While a formal retainer agreement is not dispositive, "it is a factor to consider in determining whether an attorney-client relationship existed." *See Cellco P'ship v. Certain Underwriters at Lloyd's London*, No. 05-3158, 2006 WL 1320067, at *3 (D.N.J. May 12, 2006). Another factor weighing against finding that an attorney-client relationship existed is Erez's own

4

statement—under oath—explicitly disclaiming any attorney-client relationship with Weinstein. (Filter Team's Moving Br. 5; *United States v. Erez*, No. 24-354, ECF No. 93.)

Weinstein contends, on the other hand, that Erez's sign-off on emails, letters to investors, and contracts with "Adv" after his name, which Weinstein characterizes as "Israeli law parlance," is conclusive evidence of an attorney-client relationship. (Weinstein Opp'n 3.) But simply including "Israeli law parlance" in a signature does not demonstrate that Erez was acting in his capacity as a lawyer. *See Cellco P'ship*, 2006 WL 1320067, at *3 ("[W]hile Mr. Morrissey is a licensed attorney, that does not automatically transform any professional relationship he has into an attorney-client relationship."). The Court, accordingly, finds that the evidence weighs against finding an attorney-client relationship between Weinstein and Erez, and therefore communications between them are not protected by the attorney-client privilege.

### b. Whether Communications Were Privileged

Moreover, the parties' exhibits further weigh against a finding of attorney-client privilege.[1] The Court notes that a number of documents do not appear privileged at all, even if an attorney-client relationship existed. (*See, e.g.*, Filter Team's Moving Br., Exs. A, D, F, and H.) As one example of an exhibit with messages inaccurately marked as privileged by Weinstein, Weinstein and Erez discussed where, when, and to whom to send money related to a transaction. (*see* Filter Team's Moving Br., Ex. D.) *Cf. Dist. Title v. Warren*, 265 F. Supp. 3d 17, 23 (D.D.C. 2017) (holding that questions about an attorney's "role in the transfer of funds" and any actions or instructions to that end "would not invade the attorney[-]client privilege"). Moreover, the Filter Team's exhibits overwhelmingly demonstrate that Erez and Weinstein shared only a business-

---

[1] The Government represents that Weinstein asserts an identical basis for privilege for each of his 14,844 privilege assertions. The Court finds it unrealistic that Weinstein's purported attorney-client relationship can be accurately represented on a privilege log of that magnitude in this manner.

5

partner relationship and did not maintain a relationship where legal advice was shared. (*See, e.g.*, Filter Team's Moving Br., Exs. A (discussing a business call); D (discussing logistics of money transfer); E (bank statements reflecting the money transfers); F (discussing buying jewelry for Weinstein's wife).)

The Court is also not persuaded that Weinstein's own exhibits suggest anything beyond a business relationship. Weinstein's opposition brief includes a bulleted list that provides a description of the supposed legal advice that Erez provided to Weinstein and that Weinstein sought from Erez. (Weinstein Opp'n 3.) Many of these exhibits, however, do not include legal advice at all. (*See* Weinstein Opp'n, Exs. 6 (Erez discusses logistics of sending a draft NDA); 7 (Erez states he is "preparing paperwork" with no further context); 8 (Erez messages he is "checking in the documents"); 9 (discussion of the terms in a contract with no discussion of legal implications); 10 (Erez messages he will "review the documentation"); 12 (Erez relaying information about a meeting with a business contact).) "The [attorney-client] privilege does not apply merely because a statement was uttered by or to an attorney . . . ." *HPD Lab'ys, Inc. v. Clorox Co.*, 202 F.R.D. 410, 414 (D.N.J. 2001). While the Court recognizes that transactional legal advice is in fact legal advice subject to the attorney-client privilege, business advice alone about a transaction will not suffice. *See Louisiana Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 308 (D.N.J. 2008).

B. **Crime-Fraud Exception**

The Filter Team argues that even if there was an attorney-client relationship between Weinstein and Erez, those communications are subject to the crime-fraud exception. (Filter Team's Moving Br. 3.) Weinstein argues in opposition that such a blanket application of the crime-fraud exception is improper. As previously discussed, Weinstein failed to meet his burden to demonstrate

6

the existence of an attorney-client relationship. Even if such a relationship existed, however, the Court finds that the crime-fraud exception applies.

### 1. Legal Standard

The justification behind the attorney-client privilege "ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*." *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 90 (3d Cir. 1992) (emphasis in original) (quoting *United States v. Zolin*, 491 U.S. 554, 562-63 (1989)). The crime-fraud exception exists to ensure that the attorney-client privilege does not extend to communications in furtherance of the commission of a fraud or crime. *Id.* A party asserting the crime-fraud exception to the attorney-client privilege bears the burden of demonstrating that the exception is applicable. *See In re Grand Jury Investigations*, 445 F.3d 266, 274 (3d Cir. 2006).

To successfully invoke the crime-fraud exception, the moving party "must demonstrate that there is a reasonable basis to suspect[:] (1) that the privilege holder was committing or intending to commit a crime or fraud[;] and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." *In re Grand Jury*, 705 F.3d 133, 155 (3d Cir. 2012). The reasonable basis standard does not require "evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred." *Id.* at 153-54. In general, an indictment charging the elements of the crime-fraud exception satisfies the reasonable basis test because a grand jury that issues an indictment has already found probable cause of a crime or fraud. *See United States v. Gorski*, 807 F.3d 451, 461-62 (1st Cir. 2015).

### 2.   *Analysis*

Under the first prong of the crime-fraud exception, the Government must show a reasonable basis that Weinstein "was committing or intending to commit a crime or fraud." *In re Grand Jury*, 705 F.3d at 153. The Indictment issued by the grand jury in the instant case alleges that the defendants engaged in securities fraud, wire fraud, and conspiracy to commit securities fraud and wire fraud. (*See generally* Indictment.) Specifically, the Indictment alleges that Weinstein and his co-conspirators, including Erez, his purported attorney, defrauded investors out of millions of dollars by: (1) "actively concealing Weinstein's identity and role in purported investments[;]" (2) "falsely claiming that funds would be, and were, used to invest in lucrative deals[;]" and (3) "operating a Ponzi-like scheme by using new investor money to pay off earlier investors." (*Id.* at 2.) As such, the Indictment provides a reasonable basis to believe that Weinstein was engaged in criminal or fraudulent activity, and the first prong is satisfied.

Under the second prong of the crime-fraud exception, the Government must submit a reasonable basis upon which the Court could find that Weinstein's communications with Erez were "used in furtherance of that alleged crime or fraud." *In re Grand Jury*, 705 F.3d at 153. To make this showing, the Government argues that Weinstein's communications with Erez included Weinstein directing Erez to lie about Weinstein's identity, discussion of diverting investor funds, and coordinating lies to co-conspirators, among other things. (*See* Filter Team's Moving Br. 2.) Weinstein opposes this argument by insisting that the Court must engage in an individualized document-by-document review to make such a determination. (Weinstein Opp'n 6-8.) The Court analyzes these arguments in turn.

The Filter Team maintains that the crime-fraud exception applies because Weinstein and Erez's communications were in furtherance of the crimes alleged in the Indictment, which include

securities fraud, wire fraud, and conspiracy to commit securities fraud and wire fraud. (*See* Filter Team's Moving Br. 6-8, 62-64.) The Indictment further avers that Weinstein and his co-conspirators lied to investors through false and misleading statements and omissions about Weinstein's identity and prior convictions. (*See* Indictment 6.) Specifically, the Indictment provides that Weinstein concealed his identity and involvement in and with Optimus by using an alias ("Mike Konig") when communicating with lenders, potential investors, and business partners. (*Id.*) The Filter Team has shown at least one example of communications between Weinstein and Erez discussing actions to conceal Weinstein's identity. (*See* Filter Team's Moving Br., Ex. A ("Don't forget Mike Konig sent you.").) The Filter Team has also provided examples of Weinstein and Erez diverting investor funds, (*see, e.g., id.* at Ex. D, E, and F), and lying to investors, (*see e.g., id.* at Ex G and J). The exhibits that Weinstein puts forth himself to establish an attorney-client relationship—presumably the strongest examples of such a relationship—deal with transactions that themselves use allegedly diverted investor funds, as mentioned in the Indictment, furthering the alleged fraud. (*See* Filter Team Reply 5-8; Weinstein's Opp'n, Exs. 1-5.)[2] The Court finds, based on this evidence, that the second prong of the crime-fraud exception has been met, and therefore the exception applies.

        Weinstein's argument that the Court must undertake a document-by-document approach is of no moment since this Court has found that no attorney-client relationship exists in the first instance. (Weinstein's Opp'n 7.) "[T]he decision whether to engage in *in camera* review rests in the sound discretion of the district court," which can consider factors such as the "volume of materials," "the relative importance to the case," and "the likelihood that the evidence produced

---

[2] Notably, at this point the Court has identified that all of Weinstein's exhibits either (1) do not implicate the attorney-client privilege, (2) are not privileged even if there was an attorney-client relationship, or (3) satisfy the crime-fraud exception.

. . . will establish that the crime-fraud exception does apply." *Zolin*, 491 U.S. at 572. The Third Circuit has explained that a court does not necessarily need to engage in a document-by-document review to determine whether the crime-fraud exception applies. *See In re Chevron Corp.*, 633 F.3d 153, 167 n.19 (3d Cir. 2011) ("We do not suggest that in camera review is necessary in every case in which the crime-fraud exception is invoked . . . ."). In fact, courts in the Second Circuit have applied the crime-fraud exception to "focused categories of evidence without first requiring a filter team to identify each communication subject to the exception," including "communications between a criminal defendant and his co-conspirators." *United States v. Costanzo*, No. 22-281, 2024 WL 2046053, at *4 (S.D.N.Y. May 8, 2024).[3] As Erez features prominently in the Indictment as a co-conspirator and for the other reasons stated above, the Court denies Weinstein's request for an *in camera* review of nearly 15,000 documents.[4]

    **C.    Joint Representation**

The Filter Team additionally argues that any assertion of Weinstein's that there was a "joint representation privilege" between Weinstein and Optimus and Erez because Erez represented both Optimus and Weinstein should be rejected. (Filter Team's Moving Br. 63-64; Weinstein's Opp'n

---

[3] This ruling does not foreclose Weinstein from presenting alternative evidentiary objections at trial.

[4] Weinstein contends that "the [G]overnment should present to the Court the subset of presumptively privileged communications that it seeks to introduce at trial for tailored evaluation and litigation of the privilege." (Weinstein's Opp'n 8.) This is not possible because the Filter Team will not decide what documents to introduce at trial or prosecute the case, and the Government cannot see the presumptively privileged documents before the Court decides whether or not the attorney-client privilege applies. (Filter Team Reply 22.)

to Gov't's Mot. at 7.) Weinstein's opposition brief to this renewed motion does not address joint privilege.

A joint representation arises when two or more people or entities are represented by a single lawyer. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362 (3d Cir. 2007). As this Court has found that Weinstein and Erez did not have an attorney-client relationship, Weinstein similarly could not have benefitted from any joint representation with Optimus and Erez.

### III.  CONCLUSION

For the reasons set forth above, the Filter Team's motion for rejection of Weinstein's attorney client privilege and/or the application of the crime-fraud exception is granted. The Filter Team's motion for the rejection of the joint representation claim is also granted. The Court will enter an Order consistent with this Memorandum Opinion.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE